**Slip Op. 12-139**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Nicholas Tsoucalas, Senior Judge**

|  |  |  |
|---|---|---|
| AK STEEL CORP., ALLEGHENY LUDLUM CORP, and NORTH AMERICAN STAINLESS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Court No.: 11-00366 |
| | : | |
| UNITED STATES, | : | PUBLIC VERSION |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| THYSSENKRUPP MEXINOX S.A. de C.V., and MEXINOX USA, Inc., | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

**OPINION and ORDER**

**Held:** Plaintiffs' Motion for Judgment on the Agency Record is denied because the International Trade Commission's second sunset review determinations regarding cumulation, likely volume effect, and likely price effect was based on substantial evidence.

Dated: November 15, 2012

<u>Kelley Drye & Warren LLP</u>, (<u>Daved A. Hartquist</u>, <u>Kathleen W. Cannon</u>, and <u>R. Alan Luberda</u>) for AK Steel Corp., Allegheny Ludlum Corp., and North American Stainless, Plaintiffs.

James M. Lyons, General Counsel; Neal J. Reynolds, Assistant General Counsel; Karl Von Schriltz, Office of the General Counsel, U. S. International Trade Commission, for Defendant, United States.

<u>Hogan Lovells US LLP</u>, (<u>Lewis E. Leibowitz</u>, <u>Craig A. Lewis</u>, <u>Brian S. Janovitz</u>, and <u>Wesley V. Carrington</u>) for Thyssenkrupp Mexinox S.A. de C.V. and Mexinox USA, Inc., Defendant-Intervenors.

**TSOUCALAS, Senior Judge:** Plaintiffs AK Steel Corp., Allegheny Ludlum Corp., and North American Stainless (collectively "domestic industry" or "plaintiffs") move pursuant to USCIT Rule 56.2 for

judgment upon the agency record challenging the determination of the United States International Trade Commission ("Commission") in Stainless Steel Sheet and Strip from Germany, Italy, Japan, Korea, Mexico and Taiwan, USITC Pub. 4244, Inv. Nos. 701-TA-382 and 731-TA-798-803, 76 Fed. Reg. 46,323 (2011) (second sunset review) ("Views").  The Commission and defendant-intervenors ThyssenKrupp Mexinox S.A. de C.V. ("Mexinox") and Mexinox USA, Inc. oppose the motion.

## BACKGROUND

In 1999, the Commission determined that certain imports of stainless steel sheet and strip ("SSSS") from France, Germany, Italy, Japan, Korea, Mexico, Taiwan, and the United Kingdom had materially injured an industry in the U.S., Certain SSSS from France, Germany, Italy, Japan, Korea, Mexico, and the United Kingdom, USITC Pub. 3208, Inv. Nos. 701-TA-380-382 and 731-TA-797-804 (1999), resulting in the imposition of antidumping and countervailing duty orders on August 6, 1999. Views, at 3-4.  In 2005, the Commission completed its first five-year review of those orders.  Id. at 4.  Based on the Commission's findings, the Department of Commerce revoked the orders as to France and the United Kingdom. Id. at 4-5. As a result of changed circumstances, Commerce also revoked the orders as to Italy in 2006. Id.  The Commission initiated its second five-year review of the remaining orders on September 1, 2010, id. at 5, the results of which

domestic industry appeals to this court. <u>See</u> Pls.' Mem. Supp. Mot. J. Agency R. ("Pls.' Br.") at 1-4.

Mexinox is one of several affiliated steel producers subject to the antidumping and countervailing duty orders in question. Respondents below also included German producers ThyssenKrupp Nirosta GmbH and ThyssenKrupp VDM GmbH, Italian producer ThyssenKrupp Acciai Speciali Terni S.p.A., domestic producer ThyssenKrupp Stainless USA LLC ("SL-USA"), and several affiliated importers. <u>Views</u>, at 5. The multinational ThyssenKrupp group (collectively, including other unlisted corporate affiliates, "TK") is responsible for [[      ]] of SSSS production in Germany and Italy, and [[   ]] of SSSS production in Mexico. <u>Id.</u> at 6.

Since the last review, TK has contracted $1.2 billion and spent $950 million on a new production facility in Greenfield, Alabama. <u>Id.</u> at 26-27 & n.127. TK plans to spend $1.4 billion on the new Alabama facility in total, <u>id.</u>, with the goal of adding two additional cold rolling mills, a hot-annealing and pickling line, a hot-rolling mill, and a melt shop to increase production capacity substantially over the next several years. <u>Id.</u> at 48-49. The Commission found that the facility's SSSS production capacity "[[

]]" and that its projected production is "[[

]]." _Id._ at 49.  SL-USA has control over the Alabama facility.  _Id._ at 27.

In its responses to the Commission's questionnaires, TK explained that it made its investment in SL-USA pursuant to its new "local supply strategy."  Response of SL-USA to U.S. Producers' Questionnaire (Mar. 9, 2011) Conf. Rec. 85 App'x at 10, 14-18.[1] Under the local supply strategy, TK plans to serve the North American market with SSSS produced by Mexinox and SL-USA "almost exclusively[,] . . . while [TK's] German and Italian operations focus on serving the European market."  _Views_, at 26-27; _see_ CR 96 at 7-8.  TK plans to limit imports from Germany and Italy to "small quantities of niche products not produced by SL-USA or Mexinox, such as certain embossed or pattern surfaced SSSS."  _Views_, at 49. As SL-USA increases its 300-series SSSS production, Mexinox will shift its focus onto production of 400-series SSSS.  _Id._ at 56; CR 96 at 7-8.  In addition to contracting $1.2 billion in developing SL-USA's capacity, TK reconfigured its corporate hierarchy and consolidated its steel marketing divisions under the vice president for sales at SL-USA in furtherance of this strategy.  _Views_, at 48; _see_ Intervenor-Def.'s Mem. Opp'n Pls.' Br. at 15-16 (detailing uncontroverted administrative changes).  Lastly, TK vested SL-USA's

---

[1] Hereinafter all documents in the public record will be designated "PR" and all documents in the confidential record designated "CR" without further specification except where relevant.

vice president for sales with the authority to "veto" any imports from TK's international production facilities with instructions "to wield such authority to safeguard [TK's] substantial investment in SL-USA." Views, at 50; see PR 102 at 161 ("SL-USA will not permit any action" by an affiliated foreign producer "that could potentially harm the economic viability of its operations and jeopardize the billions that we have invested in the Alabama mill.").

TK also explained that it adopted its local supply strategy in response to a series of changes in the domestic and international SSSS market arising since the last review. PR 102 at 143-44. Customers in the U.S. began to demand shorter "lead times" for SSSS products, now expecting delivery in as little as four to six weeks where they had previously tolerated six to eight weeks. Views at 44-45. Domestic producers were able to meet this expectation by increasing inventories, id. at 45, but TK found it "impossible" to do the same with its German and Italian production. Id. at 44, 50. Furthermore, logistical costs for ocean transport and raw materials increased over the period of review, rendering importation from Europe generally less feasible. Id. at 50. Lastly, the relative weakness of the U.S. dollar over the period of review resulted in higher costs for all of TK's foreign goods sold in the U.S. Id.

The Commission recognized two additional changes in the SSSS market during the last period of review. First, domestic industry

reorganized substantially and expanded its production capacity, leading the Commission to find that it stood at a much stronger competitive posture than in previous reviews. Id. at 38-41, 58-62. Second, although U.S. demand for SSSS dipped at the end of the review period due to a recession, world demand for SSSS was at its highest level of the period of review in 2010. Id. at 42-43. U.S. and world demand for SSSS is expected to increase significantly over the next several years, Mexico and Latin America included. Id.; CR 96 at 8.

After the period of review, TK announced its intention to sell its entire SSSS production unit. In a statement to the Commission regarding the planned sale, Clemens Iller, Chairman of TK's SSSS Marketing Board, wrote that the sale represents "a chance for [the] stainless [unit] to further develop its strength as a manufacturer of high-quality stainless steel and high performance alloys on an independent basis." PR 108 Ex. 3 at 2. TK offered evidence indicating that it would assemble a set of possible separation plans by January, 2012, including "an IPO[,] Spin-Off[,] . . . [and] possible strategic partnerships." Id. 2-3; see PR 102 at 206-07. Nevertheless, Chairman Iller affirmed that "there are no intentions to break the current stainless activities apart," as TK intended to sell "the stainless activities in total." PR 108 Ex. 3 at 3; see PR 102 at 206-07.

The Commission made three determinations relevant to the

present appeal.  First, based on the implications of TK's common ownership and the local supply strategy, the Commission cumulated subject imports from Mexico, Germany and Italy together on the one hand, and cumulated those from Japan, Korea, and Taiwan on the other.  Views, at 14, 26-32.  Second, relying on TK's historical practices, the likely effect of the local supply strategy, and current SSSS market conditions, the Commission found that the cumulated volume of imports from Mexico, Germany, and Italy were not likely to increase substantially in the event of revocation. Id. at 46-54.  Lastly, the Commission relied on TK's historical sales and the local supply strategy to conclude that the cumulated effect of Mexican, German, and Italian imports on prices would not be substantially depressive or suppressive in the event of revocation.  Id. at 54-64.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).[2]

## STANDARD OF REVIEW

Under 19 U.S.C. § 1516a, "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence, or otherwise not in accord with the law."

---

[2] All further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of the United States Code, 2006 edition, and all applicable supplements thereto.

19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "can be translated roughly to mean[:] [I]s [the determination] unreasonable?" Globe Metallurgical Inc. v. United States, 32 CIT 274, 275, 547 F. Supp. 2d 1371, 1374 (2008) (quoting Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006)) (alteration in Nippon).

Challenging a Commission determination under the substantial evidence standard is "a course with a high barrier to reversal." Mitsubishi Heavy Indus., Ltd. v. United States, 275 F.3d 1056, 1060 (Fed. Cir. 2001). The Commission's factual determinations "are presumed to be correct," and "[t]he burden of proving otherwise . . . rest[s] upon the party challenging such a decision." 28 U.S.C. § 2639(a)(1). The Commission's determination can be supported by substantial evidence despite the "possibility of drawing two inconsistent conclusions from the evidence." Nevinnomyssikiy Azot v. United States, 31 CIT 1373, 1379 (2007) (not published in the Federal Supplement) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). "When 'the totality of the evidence does not illuminate a black-and-white answer,' it is the role of the [Commission] as the 'expert factfinder' to decide which side is

most likely accurate." Id. (quoting Nippon, 458 F.3d at 1359).
Consequently, the court "may not 'displace the [Commission's]
choice between two fairly conflicting views,'" U.S. Steel Corp. v.
United States, 36 CIT   ,   , 856 F. Supp. 2d 1318, 1321 (2012)
(quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)),
and it may not "'reweigh the evidence or substitute its own
judgment for that of the agency.'" Id. (quoting Usinor v. United
States, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004)).

## DISCUSSION

Domestic industry objects to the Commission's cumulation,
volume, and price effects determinations — as well as the
Commission's decision to rely on TK's local supply strategy in
making those determinations — on the basis that they are
unsupported by substantial evidence.

"The [Commission] is required to conduct a sunset review every
five years after publication of an antidumping duty order, a
countervailing duty order, or a prior sunset review." Nucor Corp.
v. United States, 32 CIT 1380, 1385, 594 F. Supp. 2d 1320, 1333
(2008), aff'd, 601 F.3d 1291 (Fed. Cir. 2010) (citing 19 U.S.C. §
1675(c)(1)). In such a review, the Commission is charged with
determining "whether revocation of an order . . . would be likely
to lead to continuation or recurrence of material injury within a
reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1). The
likelihood of continuation or recurrence of material injury depends

on "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked." Id. Furthermore, in analyzing the potential for injury, the ITC has the discretion to "cumulatively assess the volume and effect of imports of the subject merchandise" from a set of countries to better assess the effect of revocation, so long as certain requirements are met. Nucor, 32 CIT at 1385-86, 594 F. Supp. 2d at 1320 (quoting 19 U.S.C. § 1675a(a)(7)).

## I. The Local Supply Strategy

As a preliminary matter, domestic industry argues that the Commission's reliance on TK's local supply strategy in support of its cumulation, volume, and price determinations renders each unsupported by substantial evidence because the local supply strategy has limited predictive value. Pls.' Br. at 9-13. "[T]he statutory term 'likely' . . . is the fulcrum upon which most of the determinations that the [Commission] is required to make in a sunset review turn." Siderca, S.A.I.C. v. United States, 29 CIT 572, 574, 374 F. Supp. 2d 1285, 1288 (2005). Courts understand "likely" to mean "'probable,' or, to put it another way, 'more likely than not.'" Id. (citing A.G. der Dillinger Huttenwerke v. United States, 26 CIT 1091, 1101 n.14, 193 F. Supp. 2d 1339 n.14 (2002); Usinor Industeel, S.A. v. United States, 26 CIT 813, 813-14, 215 F. Supp. 2d 1356, 1357-58 (2002); Usinor Industeel, S.A. v. United States, 26 CIT 1402, 1403-04 (2002) (not published

in Federal Supplement)).   "'[U]nder the likelihood standard, the Commission will engage in a counter-factual analysis: it must decide the likely impact [of revocation] in the reasonably foreseeable future.'"   Consol. Fibers, Inc. v. United States, 32 CIT 820, 829-30, 571 F. Supp. 2d 1355, 1365 (2008) (quoting Uruguay Round Amendments Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 884 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4209).

The first prong of domestic industry's argument in opposition to the Commission's reliance on the local supply strategy is that the strategy "was only in the process of being implemented, there was no evidence of actual application of that policy, and the new policy was a departure from TK's historical sales policy."   Pls.' Br. at 12.   In support of its contentions, domestic industry cites uncontroverted evidence tending to show that the Alabama facility [[

                                        ]].   Pls.' Br. at 10-11 (citing CR 135 Ex. 6).   Domestic industry also asserts that "there is no record evidence that [SL-USA] had ever exercised [its veto] authority as to Mexinox."   Pls.' Br. at 12.   In essence, domestic industry suggests that it was unreasonable for the Commission to rely on the local supply strategy in determining the likely effects of revocation because TK would not actually pursue it.

Contrary to domestic industry's assertion, the Commission

cited substantial, uncontroverted evidence demonstrating TK's actual dedication to the local supply strategy. The Commission found that "[TK's] investment of $1.4 billion in SL-USA — $1.2 billion of which has been contracted and $950 million of which has been spent — is <u>compelling</u> evidence of the company's commitment to this strategy." <u>Views</u> at 50 (emphasis added). In addition to providing SL-USA with unequivocal "veto power" over imports from other TK producers, including Mexinox, TK consolidated its "North American administration and marketing in[to] SL-USA" and placed responsibility of U.S. and Canadian sales in the hands of the vice president for sales of SL-USA. <u>Id.</u> at 27. This organizational shift corroborates TK's numerous statements before the Commission affirming its commitment to the local supply strategy. <u>Id.</u> at 27; <u>e.g.</u>, PR 102 at 143–47 ("[TK] has recognized for a long time that the local supply strategy is a competitive necessity."); CR 96 at 8 ("[[


]]."); CR 135 Ex. 1 at 10–18 ([[


]]).

     Furthermore, although domestic industry establishes that the local supply strategy is relatively new, it does not and cannot dispute the existence of new economic conditions that the Commission also relied upon to conclude that TK would likely follow

through with its plan.   Unlike domestic producers, TK found
customer demands for shorter lead times "impossible to satisfy
[when importing] from Germany and Italy," Views, at 50, given the
"financial risks associated with maintaining large inventories of
subject imports" so far from the point of production.   Id. at 45;
see PR 102 at 143-44.   "[I]ncreased logistical costs for ocean
transport and raw materials" coupled with "the weakness of the
dollar relative to the euro" further strained TK's ability to
import from abroad.   Views, at 50.   Domestic industry's "neither
surprising nor persuasive" alternative interpretation of evidence
regarding SSSS market conditions does not undermine the
Commission's own reasonable interpretation.   See Nevinnomysskiy
Azot, 31 CIT at 1379 (quoting Matsushita Elec. Indus. Co. v. United
States, 750 F.2d 927, 936 (Fed. Cir. 1984)).   The Commission
reasonably concluded and explained TK's new local supply strategy
was a commercially "logical approach" to new economic conditions,
Views, at 50, and corroborated its conclusion with uncontroverted
evidence on the record showing that TK made substantial new
investments and established new hierarchical structures in
implementing that strategy.   Id. at 27.

Second, domestic industry argues that because TK "intended to
sell a majority stake in its stainless steel business," Pls.' Br.
at 14-18 (quoting PR 107 Ex. 2), "there is no reason to anticipate
that the TK strategies and plans would be followed by the new

owner, who would then have operational control." Id. at 15-17.
Domestic industry objects to the Commission's finding that the SSSS
unit would remain intact after the sale, or at least that the new
"single owner would continue to operate those facilities as a
group." Id. at 16. "[W]hether or not TK's facility [would be]
sold intact," domestic industry continues, "the Commission's
presumption that the local supply strategy would be adopted by a
new owner based on the 'strong rationale' for pursuing that
strategy is without merit" because there are "other rational
strategies for selling products." Id. at 17.

Domestic industry's arguments are again insufficient to
undermine the Commission's reasonable reliance on the local supply
strategy. The Commission must predict the outcome of revocation
for the "foreseeable future," Consol. Fibers, 32 CIT at 829-30, 571
F. Supp. 2d at 1365 (quoting 1994 U.S.C.C.A.N. at 4209), which
domestic industry argues is "behavior projected over roughly two
years." Pls.' Br. at 13 n.4 (citing Magnesium from China and
Russia, USITC Pub. 4214 at 31 n.176, Inv. Nos. 731-TA-
10701-1072(2011) (second sunset review); SSSS from France, Germany,
Italy, Japan, Korea, Mexico, Taiwan, and the United Kingdom, USITC
Pub. No. 3788 at 48 & n.56, Inv. Nos. 701-TA-380-382 and 731-TA-
797-804 (2005) (first sunset review)). The Commission commenced
the second sunset review in 2010 and published the results in 2011,
well before the January 2012 target TK set as a deadline to develop

several different plans for selling its SSSS unit. Views, at 29

(citing PR 102 at 207).  As the record indicates little likelihood

that TK would have selected a strategy, found a buyer, and

completed the sale within the foreseeable future, domestic

industry's doubts regarding the continued application of the local

supply strategy for the foreseeable future are not persuasive.[3]

Furthermore, the Commission reasonably relied on unambiguous

evidence indicating TK would sell its SSSS unit as a whole,[4] see PR

---

[3] Domestic industry repeatedly characterizes TK's sale of
the SSSS unit as imminent, even going so far as to say that the
sale would occur in January, 2012. See Pls.' Br. at 15 (the
local supply strategy "could not be presumed to continue in 2012
following the ownership change" and the sale "was planned to
occur in less than a year"); Pls.' Reply Supp. Mot. J. Agency R.
at 4 ("TK planned to sell its stainless operations in both the
United States and Mexico by January 2012.").  The record does not
support this interpretation, as it is clear that TK only intended
to prepare plans by January, 2012. Views, at 29; see Pls.' Br. at
14 (quoting PR 102 at 207) ("[TK] also said that it would decide
in January 2012 how exactly it would go about spinning off its
stainless steel operations, following a review by a group that
had 'just recently started' to study the issue, that would
present several 'options,' and 'then a decision will be taken
which way to go.'").

[4] Domestic industry selectively quotes statements from
Chairman Iller to imply that TK is considering selling its SSSS
entities piecemeal.  Pls.' Br. at 14; Pls.' Reply at 3.  As the
Commission correctly noted at oral argument, the quotations at
issue actually refer to TK's openness to the variety of methods
of sale, not whether the sale would include each of TK's SSSS
producers.  Immediately following the text domestic industry
quotes, Chairman Iller states: "I would like to point out that
there are no intentions to break the current stainless activities
apart, but rather bring forward the stainless activities in
total." PR 108 Ex. 3 at 3 (emphasis added).  Chairman Iller was
no less clear during a hearing before the Commission, stating
that TK wants "to separate the whole [SSSS] business" such that
"all of the [SSSS] units" would be part of the deal.  PR 102 at

102 at 207; PR 108 Ex. 3 at 2-3, and as above, reasonably concluded that "short lead times[,] . . . increased logistical costs, and exchange rate volatility" would provide any future owner of the SSSS unit with a "strong rationale" to pursue the same local supply strategy. <u>Views</u>, at 29-30.

This court owes "the expert factfinder — here the majority of the Presidentially-appointed, Senate-approved Commissioners" — a considerable amount of deference in using its expertise to make such predictions, and as such, domestic industry has a high burden to overcome. <u>Nippon</u>, 458 F.3d at 1352, 1359. The Commission cited record evidence in support of its determinations concerning new economic realities of the SSSS market, which domestic industry either fails to dispute or fails to explain using more than an alternative, equally viable interpretation. Consequently, the Commission's reliance on the local supply strategy to buttress its cumulation, volume, and price determinations was reasonable. <u>See Nucor Corp. v. United States</u>, 34 CIT   ,   , 675 F. Supp. 2d 1340, 1350 (2010) ("While it is true . . . that there are circumstances under which [a foreign producer would increase imports] . . . even if doing so caused harm to [its domestic producer], the mere plausibility of a set of given circumstances is insufficient to overcome the high barrier to reversal of an agency determination.").

_____

207-08 (emphasis added).

## II. Cumulation

"In a sunset review," the Commission has discretion to "cumulate unfairly traded imports from multiple countries to adequately capture the goods' simultaneous injurious effects on the domestic industry that might otherwise be obscured in the agency's country-by-country review of the subject imports." NSK Corp. v. United States, 34 CIT   ,   , 712 F. Supp. 2d 1356, 1360–61 (2010). Under 19 U.S.C. § 1675a(a)(7), the Commission "may cumulatively assess the volume and effects of imports of the subject merchandise from all countries" subject to a sunset review if (1) the reviews of each country began on the same day,[5] (2) imports from each country would be likely to compete with each other and domestic like products, and (3) such imports would likely have a discernible adverse impact on the domestic industry. 19 U.S.C. § 1675a(a)(7); see NSK Corp., 34 CIT at   , 712 F. Supp. 2d at 1361. "[T]he Commission has wide latitude in selecting the types of factors it considers relevant in undertaking its cumulation analysis." Allegheny Ludlum Corp. v. United States, 30 CIT 1995, 2005, 475 F. Supp. 2d 1370, 1380 (2006).

Domestic industry's primary argument is that TK's imports from Mexico would not compete under similar conditions with its imports

---

[5] There is no dispute that this statutory requirement is satisfied because the Commission initiated sunset reviews with respect to all countries subject to the orders on June 1, 2010. Views, at 5.

from Italy and Germany because the record demonstrates that TK will

limit imports from Italy and Germany while maintaining

"substantial" imports from Mexico. Pls.' Br. at 21-23. As

domestic industry puts it, "TK announced a coordinated program

whereby Mexinox — which already accounted for a substantial market

share — would continue to export sizeable volumes of SSSS, while

imports from Germany and Italy would be limited to 'small

quantities of niche products.'"[6] Id. at 22 (quoting Views, at 49).

Because "the projected volumes of imports from Mexico would be akin

to those from Japan, Korea, and Taiwan, in arriving in the U.S.

market in significant volumes," domestic industry concludes, the

Commission should have cumulated Mexican SSSS imports with those

from Japan, Korea, and Taiwan. Id. at 23.

Although domestic industry demonstrates that the volume of

---

[6] The fundamental structure of TK's local supply strategy is to use Mexinox and SL-USA instead of its European producers to supply U.S. markets. PR 102 at 143-47; Views, at 26-27. Consequently, the "coordinated program" TK "announced" is none other than the local supply strategy domestic industry urges this court to ignore above. See Pls.' Br. at 18-24. Domestic industry also relies on the local supply strategy elsewhere in its briefs as convenience dictates. See, e.g., Pls.' Br. at 26 (imploring the court to evaluate its position on the Commission's volume determination while "assuming for the sake of argument that it was proper for the Commission to rely on . . . [the] local supply policy"). Unsurprisingly, domestic industry does not explain how it would fashion a remand simultaneously instructing the Commission to disregard TK's local supply strategy and to use a critical component of that strategy in crafting revised cumulation, price, and volume determinations. Because the Commission grounded its determinations on substantial evidence, however, the court need not undertake this challenge itself.

subject Mexican imports would differ from the volume of subject Italian and German imports, this fact alone is insufficient to overcome the Commission's wide latitude in using its discretion to cumulate imports from those countries based on the substantive implications of TK's common ownership. See U.S. Steel Corp. v. United States, 32 CIT 832, 834-35, 572 F. Supp. 2d 1334, 1340-41 (2008) (Commission determination not to cumulate imports under common ownership with unaffiliated imports from other countries affirmed as reasonable where those under common ownership would also compete with a domestic affiliate). Domestic industry does not and cannot argue that Japanese, Korean, and Taiwanese SSSS producers risked injuring their own corporate affiliates by importing into the U.S. Domestic industry also does not and cannot argue that in pursuing contracts and planning output, Korean, Japanese, and Taiwanese producers needed to consider a possible "veto" from a corporate affiliate. On the other hand, domestic industry acknowledges that TK would coordinate its Mexican, Italian, and German imports under a unified business plan, see Pls.' Br. at 22, and the record establishes that TK's Mexican, Italian, and German imports face competition and the threat of a veto from an affiliated U.S. production facility. Views, at 26-30. Simply put, the Commission's decision to cumulate Mexican imports with German and Italian imports was reasonable because the weight of the evidence shows similar conditions of competition between

Mexican, German, and Italian SSSS producers.

## III. Likelihood of Continuation or Recurrence of Material Injury

"After making the threshold determination whether to cumulate, the Commission must determine whether revocation of the order under review would be likely to lead to continuation or recurrence of material injury." Wieland-Werke AG v. United States, 31 CIT 1884, 1888-89, 525 F. Supp. 2d 1353, 1360 (2007), aff'd, 290 Fed. App'x 348 (Fed. Cir. 2008).  The Commission evaluates the likelihood of continuation or recurrence of injury by predicting the volume, price effects, and impact of subject imports on domestic industry. 19 U.S.C. § 1675a(a)(2)-(4).  In so doing, "[t]he Commission is required to consider any prior injury determinations, including volume, price effect, impact of imports before the order was in place, improvements in the state of the industry, industry vulnerability and Commerce's duty absorption findings." Allegheny Ludlum, 30 CIT at 2007, 475 F. Supp. 2d at 1382.  The Act provides an outline of factors for the Commission to consider in making its volume, price, and impact determinations, id., but "[t]he presence or absence of any factor . . . shall not necessarily give decisive guidance with respect to the Commission's determination."  19 U.S.C. § 1675a(a)(5).

### A. Volume

Domestic industry argues that the Commission erred in finding that subject imports from Mexico would not likely increase above

historical levels because "Mexinox is becoming even more central to TK's coordinated plans for the U.S. market than it has been at any time since the antidumping duty order was issued." Pls.' Br. at 26. Domestic industry supports this contention with record evidence that it characterizes as demonstrating that the U.S. was Mexinox's "primary market," Pls.' Br. at 25-27, that Mexinox intentionally increased its U.S. market share during the review period, id. at 27-29, that Mexinox has significant excess capacity, id. at 29-32, and that Mexinox would likely direct that excess capacity towards the U.S.[7]  Id. at 32-33.

Under 19 U.S.C. § 1675a(a)(2), the Commission determines the likely volume of imports after revocation by evaluating (1) "any likely increase in production capacity or existing unused production capacity in the exporting country," (2) "existing inventories of the subject merchandise, or likely increases in inventories," (3) "the existence of barriers to the importation of such merchandise into countries other than the United States," and

---

[7] Domestic industry also insists that TK intended to expand subject capacity at Mexinox, quoting announcements from TK to the effect that it sought to "grow with [its] customers in the months and years ahead," and "to support and grow with its U.S. Customers." Pls.' Br. at 28 (quoting PR 93 Ex. 4). As the Commission correctly points out in its response, TK's statements are actually responses to concerns about Mexinox's ability to maintain its sales given the antidumping duties in place, not any declaration of an intention to expand subject capacity. Def.'s Mem. Opp'n Pls.' Br. ("Def.'s Br.") at 28; see PR 93 Ex. 4 (addressing "valued customers" regarding "concerns surrounding recent announcements in the press on the dumping margins impacting Mexinox").

(4) "the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products." Id. § 1675a(a)(2)(A)-(D).

First, domestic industry cites the local supply strategy and Mexinox's consistent market share during prior periods of review to argue that the U.S. was and will be its "primary market."  Pls.' Br. at 25-27.  This contention is unpersuasive without a corollary explanation of how such facts demonstrate a likely increase in import volume.  See Pls.' Br. at 25-27.  The local supply strategy explicitly requires Mexinox to supply the U.S. market without harming SL-USA.  CR 96 at 8.  The 400 series grade SSSS Mexinox sells in the U.S. affects the price of the 300 series grade SSSS SL-USA produces, meaning that any excessive increase in export volume from Mexinox would adversely impact SL-USA and thus would be subject to SL-USA's veto power.  Views, at 50-51; PR 102 at 161. Indeed, domestic industry does not identify any evidence suggesting that TK's local supply strategy calls for Mexinox to increase import volume.  See also PR 93 Ex. 3 at 23 (presentation slide stating TK's intention to "replace imports by new TK Stainless mill in Alabama").

Second, domestic industry cites data showing that Mexinox's "average market share" during the current review period was [[ ]] higher than its "average market share" during the investigation,

Pls.' Br. at 28, and suggests that Mexinox would continue to increase its market share. <u>Id.</u> at 29. Domestic industry's figures are unpersuasive in light of the Commission's uncontroverted finding that TK's cumulated U.S. market share — principally comprised of Mexinox's products — remained in the [[    ]] range <u>since the imposition of the antidumping orders</u>, and that its cumulated market share is actually [[    ]] lower in 2010 than it was at the end of the investigation. Def.'s Br. at 28; <u>Views</u>, at 46–47. Domestic industry also fails to explain how a [[    ]] increase from an average [[    ]] market share during the last review is a "significant" increase, a telling omission given that ongoing restructuring and sensitivity of the domestic SSSS market could lead to frequent changes in prices and market share. <u>See</u> <u>Views</u>, at 41–46, 50—51, 56–57.

Third, domestic industry argues that Mexinox had a significant amount of excess production capacity. Pls.' Br. at 29–32. Domestic industry does not contest the facts underlying the Commission's findings with respect to Mexinox's capacity, specifically that its [[    ]] capacity utilization rate left an "[[

                              ]]." <u>Views</u>, at 47. Instead, domestic industry contends that Mexinox harbored the potential to shift its production from non-subject cut-to-length stainless steel strip ("CTLSSS") production to subject SSSS production. Pls.' Br. at

30-32.  Domestic industry supports its contention with evidence showing that "subject producers can easily shift" from CTLSS production to coiled SSSS, that "coiled SSSS involves fewer processing steps than [CTLSS] and is easier to transport and more flexible for customers to use," and that "the growth in imports of CTLSS from Mexico strongly correlates to the filing of the antidumping case."  Pls.' Br. at 30-31.

For product shifting to evidence a likely increase in import volume, "in addition to the physical ability to product-shift," the practice must "otherwise [be] a viable option."  Siderca, S.A.I.C. v. United States, 28 CIT 1782, 1797-99, 350 F. Supp. 2d 1223, 1237-38 (2004).  As the Commission recognized, CTLSS is a "value added product" that demands higher prices than subject SSSS, meaning that there is little incentive for Mexinox to abandon its CTLSS capacity.  Views, at 54.  "Moreover, U.S. demand for [CTLSS] began to increase prior to the imposition of the orders," contrary to domestic industry's assertion that Mexinox increased CTLSS production "primarily as a means of circumventing the orders on SSSS."  Id.  More importantly, the local supply strategy limits Mexinox's ability to increase imports regardless of what type of subject goods they produced.  CR 96 at 7-8.  Although it can demonstrate the possibility of product shifting, domestic industry simply does not identify evidence indicating that such a strategy would be an economically viable option for Mexinox.  See Siderca,

28 CIT at 1797-99, 350 F. Supp. 2d at 1237-38.

In further support of its excess capacity argument, domestic industry suggests that TK misled the Commission about its production capacity, citing a 2008 press report indicating that "TK planned to increase its Mexinox capacity from 295,000 short tons to 340,000 short tons," as "corroborated by Mexinox's own website as well as TK's presentation to its banks showing SL-USA supplying Mexinox with 340,000 short tons of hot-rolled SSSS feedstock by 2012/2013." Pls.' Br. at 30. The Commission reasonably chose to weigh the article, which is dated 2008 and appears on a Chinese website of unclear repute, PR 93 Ex. 2 at 1-2, less heavily than TK's more recent and highly detailed questionnaire responses. See generally, CR 96 (TK's detailed questionnaire responses). Furthermore, the "corroborating" evidence does not cast doubt on TK's questionnaire responses regarding its SSSS production capacity because neither the website nor the presentation slides differentiate between subject and nonsubject production. See PR 93 Ex. 2 at 3 (TK webpage indicating that Mexinox has an "annual cold rolling capacity of 270,000 metric tons," without further specification); id. Ex. 3 at 21 (arrow indicating flow of 340,000 short tons of "hot rolled supply" without further specification). The marginal probative value of this evidence is insufficient to support domestic industry's dubious falsification claim.

Lastly, domestic industry asserts that Mexinox's alleged

excess capacity would be directed towards the U.S. market.  The Commission determined that Mexinox would not direct excess towards the U.S. because of higher average unit prices in Mexico, a projected significant increase in Mexican demand, and the prohibitive structure of the local supply strategy. <u>Views</u>, at 52. Domestic industry criticizes the average unit value figure as being based on a non-specific mix of expensive and inexpensive products, Pls.' Br. at 33, but it does not dispute the "<u>significant [projected] increase</u> in Mexican home market demand." <u>Views</u>, at 52 (emphasis added); <u>see</u> PR 93 Ex. 3 at 7 (slide from TK's presentation to its creditors showing a map of North America indicating Mexinox would sell products made from additional feedstock from SL-USA to consumers in Mexico rather than the U.S.). In light of an uncontroverted projected increase in demand and the probable effect of the local supply strategy, the Commission's finding was reasonable despite domestic industry's objection to average unit values.

Domestic industry's four arguments are insufficient to unsettle the Commission's reasonable likely volume determination, as they are merely an invitation for this court to reweigh record evidence in its favor. <u>See</u> <u>Nevinnomysskiy Azot</u>, 31 CIT at 1379 (quoting <u>Consolo</u>, 383 U.S. at 620).  Consequently, domestic industry's challenge to the Commission's likely volume determination must fail.

## B. Price

In reviewing whether the continuation or recurrence of material injury is likely if an antidumping duty order is revoked, "the Commission shall consider" the price effects of imports without the order in place. 19 U.S.C. § 1675a(a)(3). Specifically, the Commission must consider whether "(A) there is likely to be significant price underselling . . . as compared to domestic like products, and (B) [whether] imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the price of domestic like products." Id.

Domestic industry's numerous arguments in opposition to the Commission's price determination follow two distinct paths, the first of which addresses the likelihood of significant underselling. Domestic industry asserts that the Commission ignored evidence showing that "Mexinox undersold the domestic industry . . . 54 percent of the time[] during the original investigation," "17.2 percent" after the imposition of the order, and then "34.3 percent" during the current period of review. Pls.' Br. at 34-35. Domestic industry further insists that "Mexinox . . . used [this] underselling to increase or maintain market share," given that "Mexinox's average annual U.S. market share increased" from the first period of review to the current period of review. Id. Domestic industry also cites a report prepared by North

American Stainless, one of the plaintiffs in this action, showing that offers for subject SSSS from Mexinox were "[[

]]" after SL-USA had begun production.  Id. at 36.

The Commission did not improperly ignore evidence of past underselling in determining that future underselling was unlikely. The Commission found that "culminated subject imports . . . oversold the domestic like product during the period of review . . . in 50 of 75 quarterly comparisons, or two-thirds of the time." Views, at 55.  As above, domestic industry's reliance on average market share over the investigation and each period of review obscures the Commission's reasonable finding that TK's cumulated market share remained consistently within the [[    ]] range from the investigation through the second sunset review.  Id. at 46-47. Domestic industry relies on the same figures to color Mexinox's behavior in the most advantageous light, and therefore its argument here is nothing more than an alternative interpretation of evidence on the record.  See Nevinnomysskiy Azot, 31 CIT at 1379 (quoting Consolo, 383 U.S. at 620); U.S. Steel Corp., 32 CIT at 841-42, 572 F. Supp. 2d at 1345-46 (Commission's price determination affirmed as reasonable it was supported in part by evidence of "mixed" overselling and underselling).

Domestic industry's citation to Mexinox's alleged 2011 price offers are also insufficient for this court to upset the

Commission's determination.  As the Commission explained below, the price offers are "contradicted by the pricing data on the record of these reviews, showing that imports from Mexico oversold the domestic like product in 46 of 70 quarterly comparisons."  Views, at 55 n.279.  Furthermore, the proffered evidence did "not indicate the product at issue or the source of the information" on some pages, and "did not indicate the time frame" on others.  Id.; see CR 138 Ex. 3 (chart and emails regarding alleged price offers without verifiable source citations and dates).  Even if the difference between offer prices and transaction prices is a "quibble" as domestic industry claims, the Commission acted reasonably in deciding to weigh verifiable transaction prices from the period of review more heavily than evidence of offer prices with limited source citations compiled by an interested party.

The second set of domestic industry's arguments challenges the Commission's finding that Mexinox's imports were not likely to have an otherwise significant depressing or suppressing effect on domestic prices.  Domestic industry claims that "[m]aintaining high prices in the U.S. market . . . is not TK's announced objective" because "[a]ll of TK's published materials emphasize its push for volume and market share in North America."  Pls.' Br. at 34.  Further, "[e]ven assuming that SL-USA has an incentive to manage its imports in a manner that will not harm its own business, it has no incentive to manage its imports in a manner that does not harm

the rest of the domestic SSSS industry." Id. at 38. In other words, "[t]o protect its $1.4 billion dollar investment and cover its massive fixed costs at SL-USA, TK must first maximize its sales volume," in turn causing Mexinox to lower its prices in response to an increasingly depressed U.S. SSSS market. Id. at 34.

Domestic industry's argument fails to acknowledge sufficiently one critical fact underlying the Commission's determination: SL-USA is a domestic producer. Indeed, while SL-USA's "surge in new capacity" may depress domestic prices, id. at 39, it bears little relevance to the likelihood of whether Mexinox's imports will have a "significant" depressing or suppressing effect, let alone the likely cumulated effect of all TK's imports. See 19 U.S.C. § 1675a(a)(3)(B). Under the local supply strategy, SL-USA must carefully manage subject imports from Mexinox and TK's European producers regardless of what impact its own production has on the domestic market. The Commission found that cumulated subject imports would not cause significant price depression or suppression, and domestic industry's argument here does not undermine that finding. See Views at 54-57.

In short, domestic industry has identified no evidence in either prong of its arguments demonstrating that TK's cumulated imports would cause price suppression or depression in the U.S. SSSS market, whereas the Commission grounded its likely price effect determination in substantial evidence. See U.S. Steel

**Court No. 11-00366**                                    **Page 31**

Corp., 32 CIT at 841-42, 572 F. Supp. 2d at 1345-46 (Commission determination that revocation would not have significant depressing or suppressing price effects reasonable where foreign producer's product would affect the price of affiliated domestic producer's similar product).

### CONCLUSION

Based on the foregoing, the court concludes that the Commission's determination with regard to cumulation, volume effects, and price effects are supported by substantial evidence and are otherwise consistent with the law. Therefore, the determination is hereby affirmed in its entirety and this matter is dismissed.


          /s/ NICHOLAS TSOUCALAS
          **Nicholas Tsoucalas**
          **Senior Judge**


**Dated: November 15, 2012**
       **New York, New York**

## UNITED STATES COURT OF INTERNATIONAL TRADE

### Before: Nicholas Tsoucalas, Senior Judge

```
AK STEEL CORP., ALLEGHENY LUDLUM    :
CORP, and NORTH AMERICAN STAINLESS, :
                                    :
        Plaintiffs,                 :
                                    :
    v.                              :   Court No.: 11-00366
                                    :
UNITED STATES,                      :
                                    :
        Defendant,                  :
                                    :
        and                         :
                                    :
THYSSENKRUPP MEXINOX S.A. de C.V.,  :
and MEXINOX USA, Inc.,              :
                                    :
        Defendant-Intervenors.      :
_____ :
```

### JUDGMENT

In accordance with the above, it is hereby

**ORDERED** that the plaintiffs' motion for judgment upon the agency record is denied; and it is further

**ORDERED** that the United States International Trade Commission's second sunset review determination is affirmed; and it is further

**ORDERED** that this action is dismissed.


                                    /s/ NICHOLAS TSOUCALAS
                                 **Nicholas Tsoucalas**
                                   **Senior Judge**


**Dated: November 15, 2012**
       **New York, New York**